IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WILSON DIVISION

| | |
|---|---|
| In the Matter of: | Case No.: |
| **CAPE FEAR BANK CORPORATION** | 09-05179-8-JRL |
|     Debtor | Chapter 11 |

**DISCLOSURE STATEMENT**
June 23, 2009

TRAWICK H. STUBBS, JR.
N.C. State Bar #4221

LAURIE B. BIGGS
N.C. State Bar #31845

Attorneys for the Debtor
STUBBS & PERDUE, P.A.
8450 Falls of Neuse Road, Suite 206
Raleigh, NC 27615
(919) 870-6258

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WILSON DIVISION**

| | |
|---|---|
| In Re: | Case No.: |
| **CAPE FEAR BANK CORPORATION** | **09-05179-8-JRL** |
| **Debtor** | **Chapter 11** |

## DISCLOSURE STATEMENT

Pursuant to the provisions of Section 1125(b) of the Bankruptcy Code, the Debtor hereby submits the following information:

### I. PURPOSE

The purpose of this Disclosure Statement ("Disclosure Statement") is to provide each holder of a claim against the Debtor with adequate information about the Debtor and the Debtor's Plan of Liquidation ("Plan") so that each holder of a claim may make an informed decision about whether to accept or reject the Plan.

**Exhibit "A"** to this Disclosure Statement contains a summary of the Debtor's assets.

**Exhibit "B"** to this Disclosure Statement sets forth the liabilities of the Debtor. Exhibit "B" also describes the classification of claims, including a description of whether each class is impaired or unimpaired.

All holders of claims should carefully review both the Disclosure Statement and the Plan before voting to accept or reject the Plan. Holders of Claims should not rely solely on the Disclosure Statement but should also read the Plan. The Plan provisions will control if there are any inconsistencies between the Plan and the Disclosure Statement.

### II. CLASSIFICATION AND TREATMENT OF CLASSES OF CREDITORS

**The Debtor's Plan, which accompanies this Disclosure Statement, is incorporated herein by reference. Section III of the Plan describes the treatment of the classes of claims and interests.**

THE PLAN CONTEMPLATES A LIQUIDATION OF ALL OF THE DEBTOR'S PROPERTY AND A DISTRIBUTION OF SUCH ASSETS TO CREDITORS IN ACCORDANCE WITH THE PRIORITIES OF CLAIMS, THE CODE, AND ANY FINAL ORDERS ENTERED BY THE COURT.

## III.  HISTORY, CORPORATE, STRUCTURE, AND EVENTS LEADING TO THE FILING OF THIS CHAPTER 11 CASE

The Debtor is a North Carolina corporation that has acted as a bank holding company in order to own the outstanding shares of Cape Fear Bank, its former wholly owned subsidiary. Cape Fear Bank (the "Bank"), formerly known as the Bank of Wilmington, was established in 1998 as a North Carolina chartered commercial bank. The Debtor was formed in June 2005, to act as the parent company of the Bank. A corporate restructuring and share exchange was completed in September 2005, whereby the Bank became the wholly owned subsidiary of the Debtor and the former shareholders of the Bank became shareholders of the Debtor. In October 2006, the Debtor's name was changed from Bank of Wilmington Corporation to Cape Fear Bank Corporation. The Debtor's sole purpose was to act as the parent company of the Bank and its operations and management was consolidated in most cases with that of the Bank. As the affairs of the Debtor and the Bank were intertwined, the financial condition of the Bank is intimately tied to that of the Debtor. The Debtor was a publically traded company, traded on the NASDAQ Capital Market under the symbol CAPE.  The Debtor's common stock is registered with the Securities and Exchange Commission (the "SEC") under the Securities Exchange Act of 1934.

On October 4, 2005, the Debtor created BKWW Statutory Trust I (the "Trust"), a Delaware statutory trust, in order to increase the Bank's regulatory capital. The trust was issued $10,310,000.00 of junior subordinated debentures in connection with this transaction. The trust subsequently issued $10,000,000 in preferred stock to investors and $310,000 in common stock to the Debtor.  The Debtor invested most of the net proceeds generated by this transaction in the Bank. The outstanding junior subordinated debentures in the aggregate principal amount of $10,310,000.00 remain a liability of the Debtor.

From its inception, the Bank and the Debtor were primarily managed and operated by its then President, CEO, and Chairman, John Cameron Coburn ("Coburn"). During his tenure, the Bank began an expansion project, whereby over a period of eighteen months, the Bank expanded from three branches to eight branches, including branches in Pender County and Brunswick County, resulting in significant operational and overhead costs. In addition, during this time, the Bank engaged in lending policies which led to a concentration of lending in the real estate, construction, and development industry. These steps were funded from nontraditional sources, such as borrowings and brokered deposits, creating a high risk profile.

In late 2007, Maurice J. Koury acquired over 5% of the outstanding shares of the Debtor. In December 2007, he made an offer to purchase all outstanding shares of the Debtor for $12.00 per share. On January 10, 2008, the board of directors sent a letter to Mr. Koury rejecting this offer. Thereafter, beginning in early 2008, Mr. Koury and other affiliated individuals (the "Shareholder Group") initiated a proxy contest with the Debtor, whereby the Shareholder Group sought to nominate its own slate of directors at the annual shareholder meeting. The Shareholder Group alleged that the existing management was not managing the affairs of the Bank property, was not generating acceptable value for the shareholders, and criticized the amount of executive compensation being paid.

The existing board of directors, lead by Coburn as chairman, filed their own proxy solicitations in response, disputing the allegations made by the Shareholder Group and began an expensive and protracted proxy contest, resulting in lengthy filings with the SEC and a delay in the 2008 annual meeting. This proxy contest continued until a settlement was reached in August 2008, when a formal Settlement Agreement was signed by the existing board and the Shareholder Group. Pursuant to the settlement agreement agreed to by the parties, four directors would be appointed by the Shareholder Group and four incumbent directors would remain on the board of directors. A ninth director would be selected by a committee of the directors established in the settlement agreement. The settlement agreement also called for Mr. Koury to be reimbursed his legal fees not to exceed $500,000.00.

In September 2008, Coburn resigned from all positions he held with the Debtor and the Bank, pursuant to a written Resignation Agreement. The Resignation Agreement provided that Coburn's resignation would be effective as of the date of the Resignation Agreement, and that he would receive the following payments:

- $56,730.77, representing accrued but unused vacation pay;
- $570,138.89, representing Coburn's base salary from September 19, 2008 to December 31, 2010, payable in a lump sum six months from the date of his resignation;
- $17,162.73, representing the present value of the projected cost to maintain Coburn's life and medical coverage had his employment not terminated, payable in a lump sum six months from the date of his resignation;
- $243,417.00, representing an Early Termination Benefit (as defined in the Resignation Agreement and the SERP Agreement dated June 23, 2005), payable in a lump sum six months from the date of his resignation;
- $102,443.00, representing the amount accrued and expensed under the Endorsed Split Dollar Agreement dated June 23, 2005; and
- Actual legal fees incurred by Coburn related to the Resignation Agreement and the August 18, 2008 Settlement Agreement, such amount not to exceed $35,000.00.

The Debtor has not made any of the lump sum payments as of the date of the filing of its Plan.

Effective November 24, 2008, Ralph N. Strayhorn III was appointed to serve as the President and CEO of the Debtor and the Bank. W. Lee Crouch was appointed as the chairman of the Debtor's board of directors. Following the change in management, the new officers and board of directors undertook significant efforts to improve the Debtor and the Bank's financial situation and reverse the deficiencies identified in the Bank's lending policies and capitalization structure. Notwithstanding the efforts taken by the new management team to turn around the Debtor and Bank's financial condition, on February 24, 2009, the Debtor, the Bank, the FDIC, and the North Carolina Commissioner of Banks entered into an agreement consenting to the imposition of an Order to Cease and Desist and comply with certain requirements in an effort to improve its condition. On April 10, 2009, the North Carolina Office of the Commissioner of Banks and the FDIC closed the Bank and named the FDIC as receiver for the Bank. As a result of the closure, the Debtor ceased to be a shareholder of the Bank pursuant to the Federal Deposit Insurance Act and its shares in the Bank lost all value. Furthermore, the closure caused the Debtor no longer to be a bank holding

company registered under the Bank Holding Company Act of 1956. The majority of the assets and liabilities of the Bank were assigned and assumed by First Federal Savings and Loan Association of Charleston. After this takeover, the Debtor's stock was delisted from the NASDAQ and the Debtor has focused on the steps necessary to wind down its operations and distribute its assets to its creditors.

The Debtor initiated this Chapter 11 case in an effort to wind down its operations under the supervision of the Court, and bring all claims and potential claimants to one forum so that all assets could be distributed to all known and unknown claimants. The Debtor's Plan proposes to distribute its assets pro rata to all of its creditors, in accordance with the priorities of claims, the priorities of the Bankruptcy Code, and any Final Orders entered by the Court.

The Debtor's current board of directors and officers will continue to manage the Debtor's affairs until such time as the Debtor's Plan is consummated.

### IV.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Each pre-petition executory contract or unexpired lease which was not rejected, assumed, or assigned during the Debtor's Chapter 11 case shall be deemed rejected by the Debtor as of the Effective Date unless otherwise assumed herein; provided, however, that this provision is not intended to reject and does not reject any agreement for the renewal or the extension of any loan or funds, presently binding and in effect between the Debtor and any secured creditor. All contractual provisions regarding arbitration or alternative dispute resolution are rejected in connection with the administration of this Chapter 11 case.  Any person with a Claim arising from such rejection shall be deemed to hold a Class 32 claim and shall file a proof of claim within thirty (30) days of the Effective Date or be forever barred from asserting any Claim relating to such rejection.

### V. MEANS OF IMPLEMENTATION AND EXECUTION OF PLAN

A. The Debtor will make all payments called for by the Plan on the later of (i) the Effective Date; (ii) 15 days after the deadline for filing any proofs of claim; or (iii) the date by which all claims objections have been resolved by Final Order. Until such time of distribution, the Debtor shall maintain its funds in an interest bearing account.

B. All funds necessary for the implementation of this Plan shall be obtained from funds (1) in the possession of the Debtor; or (2) derived from the liquidation of any remaining assets.

C. RESERVE FOR DISPUTED CLAIMS:  On and after the Effective Date, the Debtor will reserve distributions for the holders of Disputed Claims in a segregated account (the "Disputed Claims Reserve") for the benefit of the holders of the Disputed Claims entitled thereto under the Plan. Except to the extent that the Court shall have estimated under Section 502(c) of the Code or otherwise determined that a good and sufficient reserve for Disputed Claims is less than the full amount thereof, there will be deposited into the Disputed Claims Reserve an amount of cash which would have been disbursed on account of all Disputed Claims if all Disputed Claims were allowed in the full amount claimed by the holders thereof.  At such time as a Disputed Claim becomes an

Allowed Claim, the distribution which would have been disbursed had the Disputed Claim been an Allowed Claim on the Effective Date shall be released from the Disputed Claims Reserve and delivered to the holder of such Allowed Claim within thirty days.

  D. Except as expressly stated in the Plan, or allowed by a Final Order of the Bankruptcy Court, no interest, penalty, or late charge shall be allowed on any claim subsequent to the Petition Date. No attorney's fees or expenses shall be paid with respect to any claim except as specified herein or as allowed by a Final Order of the Court. All payments, distributions, or transfers to be made under the Plan, except as expressly provided by the Plan or the Court, shall be made without interest.

  E. Upon the entry of a Final Decree, the Debtor shall file the necessary paperwork with the North Carolina Secretary of State to cause the Debtor to be dissolved in a timely manner.

  F. Administrative claims unpaid on the Effective Date will be paid from funds on hand.

  G. All objections to claims, fee applications, and adversary proceedings will be filed with the Court within 30 days of the Effective Date.

  H. <u>Preservation of Avoided Transactions for the Benefit of the Estate</u>. All transactions avoided or otherwise set aside pursuant to Sections 544, 547, 548, and/or 549 shall be preserved for the benefit of the Estate pursuant to Section 551 and applicable case law. Funds received from such transactions shall be distributed to creditors according to the priorities of the Code. In the case of any lien which has been avoided the lien shall remain on the public record and shall remain an encumbrance upon the real property.

  I. Distributions under the Plan shall be made on the Distribution Date; provided however, that Court approved professionals may be paid as such fees and expenses are approved by the Court. Any distribution required to be made hereunder on a day other than a business day shall be made on the next succeeding business day.

  J. <u>De Minimis Distributions</u>. No distribution of less than fifty dollars ($50.00) shall be required to be made to any holder of an allowed claim except for secured claims. Instead, the Debtor shall have the option of retaining such funds to be distributed at the time of the final distribution in accordance with the Plan.

  K. <u>Unclaimed Property</u>. If any distribution remains unclaimed for a period of 90 days after it has been delivered, or attempted to be delivered, such unclaimed property shall be forfeited by such holder of the claim and the Disbursing Agent shall not attempt to make any further distribution of such holder of the claim. Undistributed property shall be returned to the Disbursing Agent for distribution in accordance with the Plan.

## VI. DISCLAIMER

All parties are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan or before voting on any other matter as provided for herein.

Statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the Disclosure Statement, and all exhibits annexed thereto. The statements contained in this Disclosure Statement are made only as of the date hereof. No assurances exist that the statements contained herein will be correct any time hereafter.

The information contained in this Disclosure Statement is included herein for purposes of soliciting acceptances of the Plan and may not be relied upon for any purpose other than to determine how to vote on the Plan. No representations concerning the Debtor are authorized by the Debtor other than as set forth in this Disclosure Statement. Any other representations or inducements made to solicit your acceptance that are not contained in this Disclosure Statement should not be relied upon by you in arriving at your decision to accept or reject the Plan.

With respect to adversary proceedings, contested matters, other actions or threatened actions, this Disclosure Statement shall not constitute or be construed as an admission of any fact or liability, stipulation, or waiver; rather, this Disclosure Statement shall constitute statements made in connection with settlement negotiations.

This Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtor or any other party. Furthermore, this Disclosure Statement shall not be construed to be conclusive advice on the legal effects, including, but not limited to the tax effects, of the Debtor's Plan. You should consult your legal or tax advisor on any questions or concerns regarding the tax or other legal consequences of the Plan.

The information contained herein is not the subject of a certified audit and formal appraisals. The Debtor's records are dependent upon internal accounting methods. As a result, valuations and liabilities are estimated. Although substantial efforts have been made to be complete and accurate, the Debtor is unable to warrant or represent the full and complete accuracy of the information contained herein.

## VII.  PAYMENTS UNDER PLAN ARE IN FULL AND FINAL SATISFACTION OF DEBT

Except as otherwise provided in Section 1141 of the Bankruptcy Code, or the Plan, the payments and distributions made pursuant to the Plan will be in full and final satisfaction, settlement, release, and discharge, as against the Debtor, of any and all claims against, and interests in, the Debtor, as defined in the Bankruptcy Code, including, without limitation, any Claim or Equity Interest accrued or incurred on or before the Confirmation Date, whether or not (i) a proof of claim or interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) such Claim or Equity Interest is allowed under Section 501 of the Bankruptcy Code, or (iii) the holder of such Claim or Equity Interest has accepted the Plan.

## VIII.  POTENTIAL MATERIAL FEDERAL TAX CONSEQUENCES

The Debtor is a publicly-traded North Carolina corporation which is treated as a subchapter C corporation for federal and state tax law purposes.  As a result, the Debtor pays tax on its taxable income at a maximum federal rate of 35%, and a maximum state rate of 6.9%.

The Plan contemplates that some debts may be satisfied for less than the full face amount of the claims.  As a result, the Debtor will recognize cancellation of indebtedness income in an amount equal to the difference between the face amount of the debt and the payment made.  Because the Debtor is in bankruptcy, Section 108(a)(1)(A) permits the Debtor to exclude the cancellation of indebtedness income from its taxable income.  The debtor will be required to reduce certain tax attributes, such as net operating loss carryforwards and basis.

The Debtor contemplates a liquidation of its assets.  The Debtor will recognize gain or loss on the sale of its assets, which gain or loss will be a combination of capital and ordinary, depending on the categories of assets sold.  The tax treatment of the Debtor's income and expenses from operations prior to liquidation, if any, will be consistent with the treatment thereof outside of bankruptcy under the Debtor's method of accounting for receipts and costs of this nature.

Any net operating losses remaining after the liquidation of the Debtor's business will be lost.  Any tax refunds to which the Debtor is entitled will be assets of the estate.

Administrative claims will be deductible by the Debtor.  Payments of principal and interest on secured or unsecured liabilities, and payments of any operating costs, will be deductible to the extent the Debtor could have deducted such payments outside of bankruptcy.

For federal income tax purposes, loan creditors who receive principal payments under the Plan generally will recognize capital gain or loss in an amount equal to the difference between the amount of the principal payments and their bases in their claim.  (A creditor may have a basis in its claim which is different from the face amount of the indebtedness as a result of charge-offs, or because it acquired its claim for something other than the face amount from the original lender.) Any interest payments received by creditors under the Plan will generate ordinary income to such creditors, to the extent such amounts have not already been accrued.

A loan creditor whose debt is significantly modified will be treated as having received a new debt instrument in exchange for the old one. This will be treated as a sale or exchange of the old debt for a new instrument with a value determined under IRS rules. This may result in the recognition of capital gain or loss by the creditor in an amount equal to the difference between the value of the new instrument and the creditor's basis in the claim.

Other creditors of the Debtor who receive payments under the Plan will recognize federal taxable income in a manner consistent with their methods of accounting for receipts of this nature.

Expenses incurred by creditors in connection with the Plan, such as legal, accounting and administrative costs, should be deductible by the creditors in accordance with their methods of accounting.

To the extent creditors are subject to North Carolina income tax, their treatment for state tax purposes will generally follow the federal treatment discussed above. The income tax treatment of creditors in states other than North Carolina is beyond the scope of this disclosure statement.

CIRCULAR 230 NOTICE: To comply with requirements imposed by the United States Treasury Department and/or IRS, any information regarding any U.S. federal tax matters contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, as advice for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein. A formal and thorough written tax opinion would first be required for any tax advice contained in this communication to be used to avoid tax related penalties. Please consult your own tax professional.

## IX.  PROVISIONS FOR VOTING ON A PLAN

A.    <u>Creditors Allowed to Vote and Deadline.</u>  Creditors holding allowed claims are entitled to vote to accept or reject the Debtor's Plan of Reorganization. The Court has fixed a date by which ballots upon the proposed Plan must be filed with counsel for the Debtor as an agent of the Court. Even though a creditor may not choose to vote, or may vote against the Plan, the creditor will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities in each class of creditors and/or is confirmed by the Court. Creditors who fail to vote will not be counted in determining acceptance or rejection of the Plan. Allowance of a claim or interest for voting purposes does not necessarily mean that the claim will be allowed or disallowed for purposes of distribution under the terms of the Plan. Any claim to which an objection has been or will be made will be allowed for distribution only after determination by the Court. Such determination of allowed status may be made before or after the Plan is confirmed.

B.    <u>Voting Provisions.</u>  In order for the Plan to be accepted by the class of creditors holding general unsecured claims , creditors that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in the total number of allowed claims of creditors voting on the Plan must accept the Plan. Under certain limited circumstances more fully described in 11 U.S.C. Section 1129(b), the Court may confirm the Plan by a "cramdown" notwithstanding the rejection thereof by more than one-third (1/3) in amount or one-half (1/2) in number of the creditors voting on the Plan. The Debtor intends to seek confirmation under 11 U.S.C. Section 1129(b) in the event any class of creditors rejects the Plan.

C.    <u>Representations Limited.</u>  No representation concerning the Debtor, particularly regarding future business operations or the value of the Debtor's assets, has been authorized by the Debtor except as set forth in this statement. You should not rely on any other representations or inducements offered to you to secure your acceptance or decide how to vote on the Plan. Any

person making representations or inducements concerning acceptance or rejection of the Plan should be reported to counsel for the Debtor.

While every effort has been made to provide the most accurate information available, the Debtor is unable to warrant or represent that all information is without inaccuracy. No known inaccuracies are set forth herein. Further, much of the information contained herein consists of projections of future performance. While every effort has been made to ensure that the assumptions are valid and that the projections are as accurate as can be made under the circumstances, the Debtor has not undertaken to certify or warrant the absolute accuracy of the projections.

No formal appraisals have been undertaken of the Debtor's property for the purpose of preparing this Disclosure Statement. The property values which were assigned and summarized below are the Debtor-in-Possession's best estimate of the values of the property as of the time of the filing of this Disclosure Statement. However, the Debtor has sought the opinions of persons experienced in valuing property in arriving at its estimates of values. These values may differ from values placed on the property at the time of the filing of the petition for relief and the subsequent schedules.

## X.  ACCEPTANCE AND CONFIRMATION

The Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to consider confirmation of the Plan. The confirmation hearing will be scheduled at a time and place to be determined by the Bankruptcy Court. The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the confirmation hearing.

At the confirmation hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. These requirements include determinations by the Bankruptcy Court that (i) the Plan has classified Claims in a permissible manner; (ii) the Plan is in the "best interests" of all Creditors; (iii) the Plan is feasible; (iv) the Plan has been accepted by the requisite number and amount of Creditors in each Class entitled to vote on the Plan, or that the Plan may be confirmed without such acceptances; (v) the Plan and its proponent comply with various technical requirements of the Bankruptcy Code; (vi) the Debtor has proposed the Plan in good faith; (vii) any payments made or promised in connection with the Plan are subject to the approval of the Bankruptcy Court as reasonable; and (viii) the Plan provides specified recoveries for certain priority claims. The Debtor believes that all of these conditions have been or will be met prior to the Confirmation hearing.

A.  **Classification of Claims**. The Bankruptcy Code requires that a plan place each creditor's claim in a class with "substantially similar" claims. The Debtor believes that the Plan's classification of claims complies with the requirements of the Bankruptcy Code and applicable case law.

B.  **The Best Interests Test**. Notwithstanding acceptance of the Plan in accordance with Section 1126 of the Bankruptcy Code, the Bankruptcy Court must find, whether or not any party in

interest objects to Confirmation, that the Plan is in the best interests of the Creditors. Bankruptcy courts have generally defined "best interests" as the Bankruptcy Code's requirement that, under any plan of reorganization, each member of an impaired class of creditors must receive or retain, on account of its claim, property of a value, as of the effective date of the plan, that is not less than the amount such creditor would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. The Debtor believes that the Plan is in the best interests of all Creditors.

To determine what the Creditors would receive if the Debtor were liquidated under chapter 7, the dollar amount that would be generated from the liquidation of the Debtor's assets in a chapter 7 liquidation case needs to be considered. The amount that would be available for the satisfaction of Claims would consist of the Debtor's interest in the net proceeds resulting from the disposition of the Estate's assets, augmented by the Debtor's interest in the cash on hand. The Estate's interest would be further reduced by the amount of any Secured Claims, the costs and expenses of the liquidation, and such additional Administrative Claims and Priority Claims that may result from the termination of the Debtor's business. These calculations are set forth in a liquidation analysis attached to this Disclosure Statement.

The costs of liquidation under chapter 7 would become Administrative Claims with the highest priority against the proceeds of liquidation. Such costs would include the fees payable to a chapter 7 trustee, as well as those which might be payable to attorneys, financial advisors, appraisers, accountants and other professionals that such a trustee may engage to assist in the liquidation.

After satisfying Administrative Claims arising in the course of the chapter 7 liquidation, the proceeds of the liquidation would then be payable to satisfy any unpaid expenses incurred during the time the Case was pending under chapter 11, including compensation for the Debtor, attorneys, financial advisors, appraisers, accountants and other professionals retained by the Debtor.

For the reasons discussed above, the Debtor has concluded that the Plan provides Creditors with a recovery that has a present value at least equal to the present value of the distribution that such Person would receive if the Estate were liquidated under chapter 7 of the Bankruptcy Code.

**BECAUSE THE LIQUIDATION ANALYSIS AND ANY PROJECTIONS WHICH MAY BE PROVIDED BY THE DEBTOR ARE BASED UPON A NUMBER OF ASSUMPTIONS AND ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES THAT ARE BEYOND THE DEBTOR'S CONTROL, THERE CAN BE NO ASSURANCE THAT THE LIQUIDATION VALUES WOULD, IN FACT, BE REALIZED IN THE EVENT OF A LIQUIDATION UNDER CHAPTER 7 OR THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY BE HIGHER OR LOWER THAN THOSE SHOWN IN THE EXHIBITS, POSSIBLY BY MATERIAL AMOUNTS.**

C.    **Feasibility of the Plan**. Section 1129(a)(11) of the Bankruptcy Code requires a judicial determination that confirmation of the Plan will not likely be followed by liquidation or the need for further financial reorganization of the Debtor or any other successor to the Debtor under the Plan,

unless such liquidation or reorganization is proposed in the Plan. The Debtor believes that the Debtor will be able to meet its obligations under the Plan.

D. **Confirmation.** The Plan may be confirmed if the holders of impaired Classes of Claims accept the Plan. Classes of Claims that are not impaired are deemed to have accepted the Plan. A Class is impaired if the legal, equitable, or contractual rights attaching to the Claims or interests of that Class are modified other than by curing defaults and reinstating maturities or by full payment in cash.

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by the holders of two-thirds in dollar amount and a majority in number of allowed claims in that class. This calculation includes only those holders of claims who actually vote to accept or reject the Plan. Votes on the Plan are being solicited only from holders of Allowed Claims in impaired Classes who are expected to receive distributions.

In the event that an impaired Class does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtor's request if (i) all other requirements of Section 1129(a) of the Bankruptcy Code are satisfied, and (ii) as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such non-accepting Class. **THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF ALL CREDITORS AND STRONGLY RECOMMENDS THAT ALL PARTIES ENTITLED TO VOTE CAST THEIR BALLOTS IN FAVOR OF ACCEPTING THE PLAN.** Nevertheless, the Debtor has requested that the Bankruptcy Court confirm the Plan over the rejection of any non-accepting Class in the event all other elements of Section 1129(a) of the Bankruptcy Code are satisfied.

A plan "does not discriminate unfairly" if the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are intertwined with those of the non-accepting class, and no class receives payments in excess of that which it is legally entitled to receive. The Debtor believes that, under the Plan, all holders of impaired Claims are treated in a manner that is consistent with the treatment of other holders of Claims with which any of their legal rights are intertwined. Accordingly, the Debtor believes the Plan does not discriminate unfairly as to any impaired class of Claims.

The condition that a plan be "fair and equitable" generally requires that an impaired class that has not accepted the plan must receive certain specified recoveries, as set forth in Section 1129(b)(2) of the Bankruptcy Code. The Debtor believes that the Plan meets the thresholds specified in this section of the Bankruptcy Code.

## XI.  EFFECT OF CONFIRMATION

A. Except as otherwise provided in the Plan, the confirmation of the Plan vests all of the property of the estate in the Debtor.

B.    <u>Injunction</u>.  As of the Confirmation Date, except as otherwise provided in the Plan or the Confirmation Order, all persons that have held, currently hold, or may hold a claim, equity interest, or other debt or liability that is treated pursuant to the terms of the Plan or that is otherwise enjoined pursuant to Section 1141 of the Code, are enjoined from taking any of the following actions on account of any such claims, equity interests, debtors or liabilities, other than actions brought to enforce obligations under the Plan: (i) commencing or continuing in any manner any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff or right of recoupment of any kind against any debt, liability, or obligation; (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation order. Notwithstanding the foregoing,

## XII.  RECOMMENDATION AND CONCLUSION

**THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE GREATEST RECOVERY TO CREDITORS AND IS IN THE BEST INTEREST OF CREDITORS, THEREFORE, THE DEBTOR RECOMMENDS THAT ALL CREDITORS VOTE TO ACCEPT THE PLAN.**

## XIII.  OTHER SOURCES OF INFORMATION AVAILABLE TO CREDITORS AND PARTIES IN INTEREST

Additional motions, affidavits, orders or other documentation which might be of interest to any holder of a claim against the Debtor in this proceeding are shown on the docket sheet maintained by the Clerk's office.  Copies of the docket sheet and actual items can be obtained from the office of the Clerk of the Bankruptcy Court:

Stephanie Edmondson, Clerk<br>
U.S. Bankruptcy Court<br>
1760-A Parkwood Boulevard<br>
Wilson, NC  27893<br>
(252) 237-0248

(this space intentionally left blank)

Respectfully submitted, this the 23rd day of June, 2009.

        s/Trawick H. Stubbs, Jr.
        TRAWICK H. STUBBS, JR.
        N.C. State Bar #4221

        s/Laurie B. Biggs
        LAURIE B. BIGGS
        N.C. State Bar No. 31845

        STUBBS & PERDUE, P.A.
        Attorneys for Debtor
        P.O. Box 1654
        New Bern, NC  28563
        (252) 633-2700

Cape Fear Bank Corporation

By: s/Ralph N. Strayhorn III
Ralph N. Strayhorn III
President and Chief Executive Officer

**Cape Fear Bank Corporation**
**Exhibit A- Assets**

| Assets | Value |
|---|---|
| DIP Account | $ 466,541.57 |
| Legal Retainer - Gaeta & Eveson, P.A. | $ 7,310.55 |
| D&O Insurance Policy | Unknown |
| Investment in Statutory Trust | Unknown |
| Trust Preferred Dividend | $ - |
| Tax Sharing Payment from Cape Fear Bank | $ - |
| Potential Tax Refund | Unknown |

**Cape Fear Bank Corporation**
**Exhibit B - Liabilities**

| **Class** | **Claim #** | **Impairment** | **Amount of Claim** |
|---|---|---|---|
| **Class 1: Administrative Claims** | | Impaired | |
| Stubbs & Perdue, P.A., Attorneys for Debtor | | | **To Be Determined by the Court** |
| Gaeta & Eveson, P.A., Special Counsel for Debtor | | | **To Be Determined by the Court** |
| Dixon Hughes, PLLC, Accountant for Debtor | | | **To Be Determined by the Court** |
| **Class 2: Ad Valorem Taxes** | | Unimpaired | **No claims expected to be filed** |
| **Class 3: Tax Claims** | | | |
| Internal Revenue Services | | Unimpaired | **No claims expected to be filed** |
| **Class 4: John Cameron Coburn** | | Impaired | $ 250,000.00 |
| **Class 5: General Unsecured Claims** | | Impaired | |
| **Class 6: BKWW Statutory Trust I** | | Impaired | $ 10,310,000.00 |
| **Class 7: Equity Security Holders** | | Impaired | |
| **Total Liabilities:** | | | $ 10,560,000.00 |